IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIDGET PALKOW, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 20-1935 |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION, | : | |
|     Defendant. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    October 28, 2021

    Plaintiff Bridget A. Palkow brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") concerning her entitlement to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act"). Pursuant to an earlier decision, Palkow had been found to be disabled beginning in 2009 and qualified for DIB benefits. In a subsequent review of her file, however, the Commissioner found that her medical condition had improved such that she was no longer disabled as of March 1, 2016.

    Presently before the Court are Plaintiff's Brief and Statement of Issues in Support of Request for Review ("Pl. Br.") (Doc. 12); Defendant's Response to Request for Review of Plaintiff ("Def. Br.") (Doc. 14); and Plaintiff's Reply Brief (Doc. 17); together with the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 11). Plaintiff asks the Court to reverse the decision of the Commissioner and order that her disability benefits be reinstated. (Pl. Br. at 29.) The Commissioner seeks the entry of an order affirming the decision of the ALJ. (Def. Br. at 26.) For the reasons set out below, we grant Plaintiff's request for review, vacate the administrative decision, and remand the matter to the Commissioner for further proceedings.

I.       **FACTUAL AND PROCEDURAL HISTORY**

The request for review presently before the Court concerns an administrative decision rendered by an ALJ on December 27, 2018. Inasmuch as that decision terminated benefits that had been awarded previously, we recount the history of both the favorable and unfavorable decisions.

      A.       **Initial record development**

Palkow first sought DIB on December 15, 2010 alleging disability as of September 15, 2009, when she was 34 years old. That claim was denied on May 6, 2011. (R. 69.) Palkow did not appeal but instead filed a new DIB claim in July 2011 (R. 61.) That application identified the conditions that limited her ability to work as hip problems (specifically, left hip congenital dysplasia[1] and degenerative joint disease of the left hip), bipolar disorder, and depression. (R. 68.) The record compiled by the state agency included documentation of visits to her family physician as well as specialized treatment for mental health complaints, including inpatient and partial hospitalization psychiatric treatment and outpatient mental health treatment. In October and November 2011, upon referral from the state agency, she underwent consultative examinations ("CEs") concerning her physical and mental limitations.

      B.       **The first administrative decision**

Upon review of the record, and with the benefit of opinions from examining and reviewing physicians, the state agency decisionmaker concluded that Palkow met the criteria for Listing 12.04 (Affective Disorders), in that bipolar syndrome created "marked" difficulties in two

---

[1] Congenital hip dysplasia refers to a condition in which one is born with the hip joint in the wrong shape or the hip socket is not in the correct place to cover and support the leg bone. This condition results in more "wear and tear" on every part of the hip joint. It often results in the individual having legs of different lengths, an unusual gait, and/or less flexibility on one side. *See* https://www.medicalnewstoday.com/articles/311902#in-children (visited Oct. 22, 2021).

of her domains of functioning: (1) maintaining social functioning, and (2) maintaining concentration, persistence, or pace.  (R. 73-74.)  The reviewing psychologist added a note to the file "suggest[ing] a 1 year diary to see how [Palkow] progresses."  (R. 74.)  On January 7, 2012, the Commissioner issued to Palkow notice that she had been found disabled as of September 15, 2009, her alleged onset date.  (R. 61.)  The notice advised that her disability decision "must be reviewed once every 3 years."  (R. 64.)

### C.   Further development of the record

In or about August 2015, more than three years after the earlier favorable decision, the state agency began to conduct a Continuing Disability Review of Palkow's file.  Since she was last approved, she had become pregnant and given birth to two children.  Due to pregnancy and breastfeeding, she had discontinued use of any prescription medications.

The state agency obtained updated treatment records from Palkow's providers and sent her for new consultative examinations to assess her psychiatric and physical conditions.  (R. 452-76.)  Angela Chiodo, M.D., conducted a psychiatric CE on January 21, 2016, providing an evaluation report and a residual functional capacity assessment.  In light of Palkow's account that she was doing well and not taking any medications, coupled with a normal examination, Dr. Chiodo concluded that Palkow carried no psychiatric diagnoses and that she faced no psychiatric work-related limitations.  (R. 452-60.)  She noted that Palkow's "[p]rognosis [was] good given her present functional abilities and absence of mental health symptoms."  (R. 455.)

### D.   The second administrative decision; subsequent ALJ hearing

On March 15, 2016, the State agency issued to Palkow a Notice of Disability Cessation, advising her that she was found no longer disabled as of March 1, 2016.  (R. 94-97.)  Palkow requested reconsideration and participated in a videoconference hearing before a State agency

Disability Hearing Officer on October 18, 2016. In a decision issued on November 1, 2016, the Hearing Officer determined that Palkow's mental impairment had improved and that she was capable of performing unskilled, sedentary work. (R. 103-12.) Palkow then requested a hearing before an Administrative Law Judge.

The ALJ convened a hearing on October 26, 2018 to consider whether Palkow's disability had ended. Palkow appeared with counsel. She testified that she had discontinued her psychiatric treatment, against medical advice, because she wanted to become pregnant and that she returned to therapy and then to pharmacological treatment after she finished breastfeeding her children. (R. 47-49.) She also testified that her difficulties with walking and standing caused by her congenital hip condition had only become worse over the years, and that she underwent a hip replacement surgery in September 2018, a month prior to the hearing. (R. 39-40.) A vocational expert ("VE") testified at the hearing about the vocational requirements of Palkow's past work. He also responded to questions concerning jobs available for a hypothetical individual capable of a restricted range of sedentary work and who needed to change from a seated to a standing position every 20 minutes.

On December 27, 2018, the ALJ issued an unfavorable decision, consistent with the earlier finding of the state agency, that Palkow's period of disability ended on March 1, 2016 and that she had not become disabled again since that date. (R. 12.) Palkow sought review in the Appeals Council, but that body found no basis for overturning the ALJ's decision. (R. 1-6.) The Appeals Council denial of Plaintiff's request for review rendered the ALJ's decision the final decision of the Commissioner. This litigation followed.

## II.   STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's decision that Palkow's disability ended on March 1, 2016. 42 U.S.C. § 405(g); *Rutherford v.*

4

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).  Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford*, 399 F.3d at 552.  The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence.  *Richardson*, 402 U.S. at 390 (citing 42 U.S.C. § 405(g)); *Rutherford*, 399 F.3d at 552.  The review of legal questions presented by the Commissioner's decision, however, is plenary.  *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

### III.   DECISION UNDER REVIEW

The issues before the ALJ were: (1) whether Palkow's disability, which was first recognized in January 2012, ended by March 1, 2016, and (2) whether Palkow had otherwise become disabled again at any point as of the December 27, 2018 date of the ALJ's decision. (R. 15-23.)

To resolve the question of whether Palkow's disability continued, the ALJ employed an eight-step sequential evaluation process, which is set out at 20 C.F.R. § 404.1594.  *See* R. 12-13 (describing process).  At Step One, the ALJ found that Palkow had not engaged in substantial gainful activity from her disability onset date through the date of decision.  (R. 14, Finding No. 3.) At Step Two, she found that Palkow suffered from impairments that were "severe" within the meaning of the Regulations. (R. 14, Finding No. 4.)

At Step Three in this eight-step process, the ALJ is required to make a finding as to "medical improvement," which is defined as any decrease in medical severity of the impairments and must be established by improvement in symptoms, signs and/or laboratory findings when viewed against the comparison point decision ("CPD"), which in Palkow's case was the favorable

determination dated January 7, 2012. She found that medical improvement had occurred as of March 1, 2016. (R. 15, Finding No. 6.) The ALJ then proceeded to Step Four, at which she found that the medical improvement was "related to the ability to work," inasmuch as Palkow "no longer had an impairment or combination of impairments that met or medically equaled the same listing(s) that was met at the time of the [comparison point decision]." (R. 16, Finding No. 7.)

This outcome of the Step Four analysis permitted the ALJ to skip Step Five and to proceed to Step Six, at which the ALJ is to evaluate whether the claimant's impairments, given the medical improvement as of March 1, 2016, met the standard for severity. The ALJ found that Palkow satisfied the severity requirement. (R. 16, Finding No. 8.) The ALJ thus proceeded to determine Palkow's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can still do despite [her] limitations," as of the March 1, 2016 date at which she had been alleged to have improved. 20 C.F.R. § 404.1545(a)(1). The ALJ made the following finding:

> **5. After careful consideration of the entire record, the undersigned finds that, since March 1, 2016, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no pushing/pulling for operation of foot controls with the left lower extremity. In addition, the claimant can perform occasional postural activities except no climbing of ladders/ropes/scaffolds, occasional exposure to exposure [*sic*] extreme could/wet/humidity/ vibration, no exposure to hazards. The claimant is further limited to routine and repetitive tasks not permitted on an assembly line and only occasional social interaction with others. Finally, the claimant must have the option to alternate between sitting and standing in 20 minute intervals.**

(R. 16, Finding No. 9.) As in Step Four of the 5-step process, Step Seven here requires an evaluation of whether that residual functional capacity permitted the performance of past work. The ALJ determined that, with this RFC, Palkow was still not capable of performing her past work as a Veterinarian Technician, which was characterized as a skilled job at the medium exertional

level. (R. 21, Finding No. 10.) Moving on to Step Eight, the final step, the ALJ assessed whether Palkow could do other work since March 1, 2016 with that RFC. She considered the extent to which the occupational base at the "sedentary" exertional level was eroded by the additional postural, environmental, and other restrictions included in the RFC finding. Relying upon VE testimony that the positions of table worker, order clerk, and toy stuffer were not precluded by someone with what the ALJ found to be Palkow's RFC, the ALJ determined that there were occupations that Palkow could perform that existed in significant numbers in the national economy. (R. 22-23 & Finding No. 14.) Accordingly, she concluded at Step Eight that Palkow's disability ended on March 1, 2016 and that she had not become disabled again since that date. (R. 23, Finding No. 15.)

IV.   **DISCUSSION**

Plaintiff argues that errors at several steps in the Eight-Step Evaluation require that the Court vacate the ALJ's decision finding that her disability ended on March 1, 2016. Proceeding in the order in which the issues would arise in that sequential process, she first contends that the ALJ should have found that she met or equaled Listing 1.02(A) for major dysfunction of a joint due to her hip impairment, which would have led to a finding of continued disability at Step Two of the Eight-Step process. (Pl. Br. at 16.) Second, she challenges the ALJ's finding as to medical improvement in her mental health impairment, which was addressed at Step Five. (Pl. Br. at 22.) Third, she assails the ALJ's evaluation of her subjective complaints and their consistency with the record at large in the formulation of her RFC for the period after March 1, 2016. (Pl. Br. at 24.) Fourth, she argues that the ALJ's hypothetical to the VE should have included additional limitations, which would have resulted in a different finding at Step Eight. (Pl. Br. at 27.)

We agree that the ALJ's decision as presently formulated cannot withstand substantial evidence review and that the matter must be remanded to the Commissioner for further

consideration. We reach this conclusion having considered Plaintiff's challenge to the ALJ's RFC finding made soon after her hip replacement surgery as well as the ALJ's evaluation of the Listings pertinent to major joint dysfunction. We address Plaintiff's issues below in the order in which they were presented but provide an abbreviated discussion where the challenged finding was not outcome-determinative or pertinent to the reasons we find for remand.

    **A.    Was the ALJ's finding that Palkow did not meet or equal Listing 1.02(A) supported by substantial evidence?**

Although Palkow's earlier disability finding was based upon a listing-level *mental* impairment, she contends here that the ALJ erred in finding, as to the period from March 1, 2016 onward, that she did not meet the criteria for Listing 1.02(A) relating to major dysfunction of a weight-bearing joint. She criticizes the ALJ's analysis on this question as having been so conclusory as to deprive the court of the opportunity "for meaningful judicial review," and asserts that the paucity of analysis renders the decision "not supported by substantial evidence." (Pl. Br. at 18, citing *Burnett v. Commissioner of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).) She also faults the ALJ's decision for omitting analysis of orthopedic opinions that bore on Listing 1.02(A). (Pl. Br. at 19.)

At Step Two of the Eight-Step process, the ALJ was required to assess whether Palkow's impairment(s), either singly or in combination, met or equaled any listing at any time from the date of the challenged cessation of benefits (March 1, 2016) up to the time of the ALJ's decision (December 27, 2018).[2] If impairments met the listing, then Palkow would be found to still be

---

[2] This analysis did not require the ALJ to make any comparison with a prior decision. Rather, it simply required the ALJ to determine whether Palkow had any impairment (or combination thereof) that met or medically equaled the Listings. In that case, Palkow's "disabled" status would be deemed to have continued and the cessation of benefits would have been reversed.

disabled; if not, then the evaluation process would continue. In her finding at Step Two, the ALJ specifically addressed the applicability of Listing 1.02(A). Listing 1.02 provides that:

> 1.02 *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

29 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A).[3] The referenced definition regarding the inability to ambulate effectively is further set out in an introductory section of this grouping of listed impairments:

> b. *What We Mean by Inability To Ambulate Effectively*
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. …
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces,

---

[3] Listing 1.02 also contains a subsection (B), which establishes criteria for "[i]nvolvement of one major peripheral joint in each *upper* extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c." (Emphasis added.) It is undisputed that subsection (B) would not apply to Palkow.

> the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.
>
> …
>
> *d. Pain or other symptoms.* Pain or other symptoms may be an important factor contributing to functional loss. In order for pain or other symptoms to be found to affect an individual's ability to perform basic work activities, medical signs or laboratory findings must show the existence of a medically determinable impairment(s) that could reasonably be expected to produce the pain or other symptoms. The musculoskeletal listings that include pain or other symptoms among their criteria also include criteria for limitations in functioning as a result of the listed impairment, including limitations caused by pain. It is, therefore, important to evaluate the intensity and persistence of such pain or other symptoms carefully in order to determine their impact on the individual's functioning under these listings. See also §§ 404.1525(f) and 404.1529 of this part, and §§ 416.925(f) and 416.929 of part 416 of this chapter.

*Id.*, § 1.00(B)(2).  With respect to the particular issue of assistive devices, another referenced introductory section provides:

> 4. *Hand-held assistive devices.* When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, examination should be with and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual. The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented. The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.

*Id.*, § 1.00(J).

The ALJ found that Palkow satisfied the first requirement in that she had a "gross

10

anatomical deformity" meeting the Listing definition.  However, the ALJ determined that Palkow's impairment did not meet or medically equal the listing in that "the record does not demonstrate an inability to … ambulate effectively … resulting from said deformity." (R. 14.)[4] Plaintiff faults the ALJ for not saying more, including that her bone broke after surgery and that she was always noted to have a limp.  While we do not find it necessary for the ALJ to discuss in the Listings analysis all of the medical notes concerning ambulation, Palkow's record contained a number of ambiguities that warranted further discussion by the ALJ as to whether she was unable to "ambulate effectively" within the meaning of the Regulations during the entirety of this period.

The Listing required Palkow to demonstrate that she was "generally" unable to ambulate independently "without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," e.g., a walker or two canes or crutches.  29 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).[5]  The Listing also provides as an example of ineffective ambulation, however, "the inability to walk a block at a reasonable pace on rough or uneven surfaces[.]" *Id.*, § 1.00(B)(2)(b)(2).  Plaintiff points to the opinion of one of the consultative examiners, Dr. Monfared on January 21, 2016, that she was unable to do just that.  (R. 469.)[6]  The ALJ, however,

---

[4]  The extent of her discussion of the applicability of any of the physical listings is contained in a single sentence: "With respect to listing 1.02, while there is a gross anatomical deformity, the record does not demonstrate an inability to either ambulate effectively or perform fine and gross movements effectively results from said deformity." (R. 14.)  The latter phrase refers to the requirements under 1.02(B), pertaining to upper extremity impairments, which are not at issue here.

[5]  We recognize there was a question as to whether, despite Palkow advising her doctors and the ALJ that she used a walker (although she did not bring one to her consultative examinations), one was *prescribed*.  She advised one of her doctors that she had a walker and wheelchair in the past that were stolen.  (R. 593.)

[6]  We concede that this aspect of Dr. Monfared's opinion was rather unusual in that she otherwise found that Palkow was capable of many work activities at even a heavy exertional level.

does not discuss this finding. We agree with Plaintiff that the ambulation component of Listing 1.02(A) require further discussion.[7] This deficiency warrants a remand.

### B. Was the ALJ's finding that Palkow experienced medical improvement supported by substantial evidence?

Plaintiff next challenges the ALJ's finding at Step Three of the Eight-Step sequential evaluation process. She asserts that the mental health conditions for which she was previously found disabled "have never improved to the point of non-disability." (Pl. Br. at 22-23.) She also contends that functional limitations arising from her hip impairment "have increased, rather than decreased." (*Id.* at 23.)

At Step Three, the ALJ was required to determine whether medical improvement had occurred. 20 C.F.R. § 404.1594(f)(3). The Regulations define "medical improvement" as "any decrease in the medical severity of [the] impairments" that led to the finding of disability. 20 C.F.R. § 404.1594(b)(1). It "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs and/or laboratory findings associated with" the impairments. *Id*.

Palkow was found to be disabled in 2012 because she met the Listing for 12.04, specifically meeting the required criteria in the combination of subsections (B)(2) and (B)(3). The ALJ was thus required to evaluate the evidence as to the medical severity of Palkow's affective disorder and assess whether there was substantial evidence of a decrease in the medical severity of that

---

[7] In the portion of the decision justifying her RFC finding, the ALJ often recounted what the claimant or the medical evidence indicated concerning ambulatory assistance. Her discussion suggests that the lack of documentation in the record of an *order* by a doctor for a walker, and the observation of consultative examiners that Palkow did not *bring* an assistive device to her appointments, might support the notion that Palkow could ambulate effectively. *See, e.g.,* R. 17-19. She did not, however, purport to undertake an analysis under the definitions from Section 1.00 of the Listings concerning effective ambulation.

impairment.[8]

As set forth above, for the period between September 2009 and January 2012, the prior state agency decisionmaker found that Palkow met the listing for 12.04 in that she carried a diagnosis of bipolar disorder and her degree of restriction was "marked" as to maintaining social functioning and maintaining concentration, persistence, and pace. Following the 2018 hearing, however, the ALJ found that Palkow's degree of restriction in these areas was, at most, only "moderate." (R. 15.) Where she announced her finding as to medical improvement in the decision, the ALJ provided the following explanation:

> The medical evidence supports a finding that, by March 1, 2016, there had been a decrease in medical severity of the impairments. For instance, at the CPD [the comparison point decision of January 2012], the claimant was in a partial hospitalization program four days per week (see e.g. 7F). Since March 1, 2016, the claimant has not required such intensive care. In fact, her care has been routine and conservative. Additional rationale for this finding is provided in Finding No. 9.

(R. 15.) In the referenced later discussion at Finding No. 9, the ALJ recounted notable features of the psychological consultative examination from January 2016, including Dr. Chiodo's comment that "the results of the examination do not appear to be consistent with any psychiatric problems that would significantly interfere with the claimant's ability to function on a daily basis." (R. 18, quoting Ex. 13F/4.) The ALJ also noted that at the time of that consultative examination, Palkow had not been in treatment, although she later resumed outpatient treatment in December 2016. (R. 18.) By July 2018, after having switched clinics a year earlier, she reported to her providers that

---

[8] While Palkow's hip impairment was also one of the impairments that she alleged in her 2011 initial application caused her to be disabled, she was approved at Step Two of the Five-Step Evaluation Process because she met the listing for affective disorder. Therefore, the mental health condition was the one against which the ALJ assessed medical improvement.

she was happy with how her combination of medications was working and saw great improvement in her sleep, mood, and motivation. (R. 19.) The ALJ offered the following summary:

> With respect to the claimant's mental health impairment, the undersigned notes that the claimant's treatment has been sporadic at best in the past few years. Moreover, her treatment has been routine and conservative, without need for frequent emergency department visit[s], crisis interventions, or psychiatric hospitalization of any kind since March 1, 2016. Moreover, the claimant acknowledged that she stopped mental health treatment and medications in order to have a family. The undersigned notes that the cessation of treatment did not result in an exacerbation of her condition. This fact supports medical improvement.

(R. 19.)

There was "substantial evidence" in the record cited by the ALJ to justify her conclusion that Palkow experienced "medical improvement" from the time of her listing-level affective disorder in 2012 to her status on March 1, 2016. Palkow discontinued mental health treatment sometime in 2012 to start a family and was still symptom-free when examined by the consultative examiner in January 2016. She did not return to treatment until December 2016. Even at that point, she was not in the state of crises and "marked" limitations that characterized her condition when she was approved for DIB in 2012. We have no trouble accepting the ALJ's finding at step Three of the Eight-Step evaluation.

### C. Was the ALJ's finding that Palkow could perform sedentary work if given a sit-stand option supported by substantial evidence?

Plaintiff next contends that the ALJ's faulty RFC finding is attributable to a determination that Plaintiff's subjective complaints were "not entirely consistent with the objective medical and other evidence," and that this conclusion by the ALJ was not supported by substantial evidence. (Pl. Br. at 24 (quoting R. 19).) She challenges conclusions the ALJ reached as to both her physical and mental impairments. We agree that the ALJ's RFC finding lacks the support of substantial

evidence as to the physical limitations. In the interest of judicial economy, we address only that issue and forgo further review of the mental health limitations assessed by the ALJ. *See* R. 16 (finding that Plaintiff should be restricted from work with pace or production quotas, as well as anything more than occasional social interaction with others, and that the work had to be routine and repetitive tasks).

With respect to Palkow's physical condition, Plaintiff faults the ALJ for discounting the effects of her physical symptoms prior to her September 2018 surgery. She contends that she testified consistently at the October 2018 ALJ hearing about the effect on her of sitting for 15-20 minutes and the several minutes she needed once in a standing position before she could walk. (Pl. Br. at 26.) She contends that "[t]here is simply no medical evidence to support the ALJ's conclusion that despite severe and advanced bone-on-bone osteoarthritis in a dysplastic left hip, the plaintiff could have sustained" the physical activity contemplated in the RFC. (Pl. Br. at 26.) We agree.

In support of her declaration that Plaintiff's statements were not entirely consistent with the objective evidence, the ALJ offered the following:

> Regarding the claimant's orthopedic problems, although the claimant eventually required surgery, her care since March 1, 2016, through approximately September 2018 was routine and conservative. The undersigned also notes that despite the claimant's assertion that she has required an ambulatory assistance device for the past several years[,] such a device was not noted in any of her treatment records until just before her surgery in October 2018.[9] Furthermore, the claimant's activities of daily living support a greater degree of physical capability than expressed in the claimant's testimony or in her written submissions.

---

[9] Palkow indicated in a Disability Report that the walker had been ordered in 2009.

15

(R. 19.) The ALJ continued with an acknowledgement that Palkow "experienced significant pain and dysfunction due to her congenital hip problem[,]" that she underwent a total hip replacement, and that she "was in obvious discomfort at the hearing due to the operation" less than a month earlier. (R. 19.) The ALJ added that, "[h]owever, it is anticipated that the claimant will improve with reasonable recovery time and treatment," and the RFC finding "addresses any residual pain and/or dysfunction of the hip." (R. 19-20.) The RFC provided that Palkow would perform sedentary work, which is defined as sitting for up to 6 hours in an 8-hour workday and standing or walking for the remainder, but that she must have the option to alternate between sitting and standing in 20-minute intervals. (R. 16.)

Plaintiff points to the places in the record – in a December 2015 Function Report, at her October 2016 CDR hearing, and at her October 2018 ALJ hearing – in which she complained about limitations due to her hip impairment. *See* Pl. Br. at 25-26. The ALJ accepted that Palkow suffered from certain limitations at the time of the hearing due to the recency of her surgery, but she assumed that the surgery was "successful" and that the pain and limitations were short-lived. The record belies those assumptions. Plaintiff described great pain prior to her surgery and repeated dislocations of her hip that caused her to fall. Yet sitting was also painful, and her form of relief was to lean back on her bed or lay on her side – which certainly were not accommodations offered by the ALJ's RFC finding. The ALJ's assumption that the surgery resolved Plaintiff's issues was not founded in the record. Palkow testified that following the surgery her bone broke further and that the replacement hip has only relocated the pain, not removed it. At the hearing she was unable to sit without leaning on her right side and with her left leg extended. The ALJ assumed that her post-surgical pain and elevation need was merely a temporary problem. But Plaintiff testified credibly that her replacement hip was implanted in the front of the joint, rather than the side, and

that it locks up and jams. She also reported that she expected to have additional surgeries to secure the implant and address arthritis in her sacral joints, which had led to her back stiffening up.

With all of the evidence of continued difficulties caused by the hip dysplasia and osteoarthritis there, we agree with Plaintiff that the ALJ failed to support her RFC finding with evidence that could be considered "substantial" as to her physical capacity since March 1, 2016 for this modified range of sedentary work. This deficiency contributes to the need for a remand.

> **D.     Did the VE's testimony constitute substantial evidence to support the ALJ's conclusion that Palkow could perform other work?**

Plaintiff's final contention is that the ALJ's conclusion that she could perform other work is not supported by substantial evidence and does not satisfy the Commissioner's burden that other work exists that she can perform considering her RFC, age, education, and past work experience. (Pl. Br. at 27.)

What Plaintiff is challenging here is not how the ALJ applied the RFC finding to the VE's testimony. Rather, she argues that "an RFC for less than a full range of sedentary and unskilled work is warranted." (Pl. Br. at 28.) This issue is necessarily tied to the RFC finding discussed above. The VE's testimony did not otherwise create any error in the ALJ's decision.

**V.     CONCLUSION**

The ALJ found that Palkow was capable of work at a modified sedentary level beginning March 1, 2016 based upon her assessment that Palkow's hip condition and pain could be accommodated by a seated position with a sit/stand option every 15-20 minutes. However, the evidence of record fails to provide substantial support for such a conclusion. Moreover, there is a legitimate question as to whether Palkow meets or equals the criteria for Listing 1.02(A), which the ALJ failed to adequately address. For the reasons discussed above, we find that the Commissioner did not meet her burden to show that Plaintiff had an RFC that permitted the

performance of other jobs, and that she may not have had to reach that question given a more thorough evaluation of the applicability of Listing 1.02(A), which could result in a finding of continued disability, albeit on different grounds. These defects require that the administrative decision be vacated and the matter be remanded to the Commissioner for further proceedings.

    An appropriate order follows.